### MAYNARD et ux. v. GILLIAM et al.
(No. 9379.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 30, 1920. Rehearing Denied Dec. 4, 1920.)

1. **Mines and minerals** &#9286;&#8594;57—**Contract to execute oil and gas lease not a present conveyance.**

Instrument executed by plaintiffs, oil and gas lessors, in favor of defendant, whereby plaintiffs agreed to execute and deliver to defendant an oil and gas lease if his suit to invalidate the prior lease by plaintiffs to a company was successful held dependent on a future contingency and not construable as a conveyance of the minerals in presenti, but merely as a contract to convey them on happening of the contingency.

2. **Homestead** &#9286;&#8594;114—**Oil and gas lease held unenforceable.**

Under the Constitution, a so-called oil and gas lease, which was a mere contract of husband and wife to convey minerals in their land, held unenforceable as against their homestead.

3. **Acknowledgment** &#9286;&#8594;25 — **Wife can retract conveyance of homestead until moment of privy examination.**

In the conveyance of the homestead, the wife has until the very last moment of her privy examination within which to retract her contract or act in conveying the homestead.

4. **Mines and minerals** &#9286;&#8594;55(7) — **Minerals conveyed by husband and wife, which conveyance was abandoned, resumed original status.**

If husband and wife conveyed minerals in their homestead to a corporation, the minerals were no longer subject to lawful disposition by the husband and wife, and if the corporation's lease was invalid and failed to operate as a conveyance, the minerals necessarily remained part of the homestead of the husband and wife, and if thereafter they again separated and segregated the minerals from their homestead and the conveyance was abandoned, set aside, and rescinded, the minerals again resumed their original status.

5. **Mines and minerals** &#9286;&#8594;55(1), 58—**Contract held not sufficiently definite and specific to operate as lease of a conveyance of minerals.**

Contract executed by husband and wife, obligating themselves to convey minerals in their homestead land to defendant if he were successful in attacking prior oil and gas lease executed by such husband and wife to a corporation, held not sufficiently definite and specific within itself to operate as a lease or conveyance of the minerals to defendant, in the absence of actual removal of the minerals from the homestead of which they were legally a part, precluding valid disposition by mere contract to separate in futuro.

Appeal from District Court, Eastland County; E. A. Hill, Judge.

Suit by J. C. Maynard and wife against C. A. Gilliam and others. From judgment for defendants, plaintiffs appeal. Reversed and rendered for plaintiffs.

W. J. Oxford, of Thurber, S. W. Marshall, of Dallas, and Chandler & Pannill, of Stephenville, for appellants.

McCutcheon & Church, Barry Miller, and Muse & Muse, all of Dallas, for appellees.

CONNER, C. J. As originally instituted, this suit was by J. C. Maynard and wife against C. A. Gilliam and L. Morgan West and certain others, as assignees of Gilliam and West, to cancel an oil and gas lease. The lease attacked, of date March 15, 1919, covered 161 acres of land, which was at the time and yet remains the homestead of appellants. The lease was attacked on the ground of fraud, the particular specifications of which need not be stated.

The defendants other than Gilliam and West filed disclaimers, and were dismissed. Gilliam and West, after denying the fraud, specially pleaded that the lease sought to be canceled had been rescinded and annulled

---

&#9286;&#8594;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

by a certain contract, dated March 19, 1919, and that said contract had been substituted for and was in lieu of said lease of March 15th; said special plea being in substance as follows:

"Your defendants show that on the 19th day of March, 1919, the plaintiffs and these defendants mutually agreed to substitute for a legal, good, and valuable consideration a second contract and lease in lieu of the lease of March 15, 1919. (A copy of said contract and lease, between the plaintiffs and the defendants of March 19, 1919, is marked Exhibit X, attached hereto, and made a part hereof, and each and all of the allegations contained in said contract and lease of March 19, 1919, are here specially pleaded as though same were set out in this paragraph.)"

The plaintiffs replied in a supplemental petition by demurrer, and also alleged that the instrument of March 19th, pleaded by the defendants, had been procured by the false and fraudulent representations originally urged against the lease of March 15, 1919. It was further alleged that the premises described in said contract of March 19, 1919, was the homestead of the plaintiffs at the time of the execution of the same, and still was their homestead; that the contract of March 19, 1919, being an option for a lease on appellees' homestead and an executory contract for a lease and an agreement for the execution of an instrument in the form of a lease on plaintiff's said homestead, the same was void, and could not be enforced; that plaintiff, Blanche Maynard, was a married woman, and could not bind herself to execute a lease in the future in any manner affecting her said homestead; that said contract was void and unenforceable, in that the same is not an oil and gas lease, but an alternative option, and indefinite and uncertain, and does not provide any time for the termination of the same, etc.

The case was submitted upon special issues, and upon the findings of the jury the court rendered a judgment for the defendants, adjudging costs against the plaintiff and decreeing that—

"C. A. Gilliam and L. Morgan West have a writ of possession as provided by law, in accordance with the terms and stipulations of the reformed lease and contract of March 19, 1919, which said instrument is heretofore set out."

From the judgment so rendered, the plaintiffs have duly prosecuted this appeal.

The instrument of date March 19, 1919, and specially pleaded by the defendants, Gilliam and West, is in words and figures as follows:

"Contract.

"This agreement, made and entered into this 19th day of March, 1919, by and between J. C. Maynard and wife, Blanche E. Maynard, of Eastland county, Texas, parties of the first part, and L. Morgan West of Pueblo, Colorado, and C. A. Gilliam of Dallas, Texas, parties of the second part, witnesseth:

"Whereas the said first parties did on the 14th day of March, 1917, execute and deliver to the Texas & Pacific Coal Company an oil and gas mining lease for the period of seven years from said date, covering and described in the following lands situated in Eastland county, state of Texas, to wit: 160 acres out of the T. Harrison survey, abstract No. 1587, being land purchased by said J. C. Maynard from George Weihegar and being fully described in the deed records of Eastland county, Texas, to which reference is made for a more particular description; and

"Whereas, the Texas & Pacific Coal Company has failed to carry out and perform the obligations imposed upon it by the terms of said lease in that it has failed to pay the rentals therein specified at the date therein specified; and further that it has failed to commence any operations for drilling an oil well on said premises as provided in said lease and has indicated no purpose or intention to do so; and

"Whereas said second parties are desirous of purchasing from first parties an oil and gas lease on said premises with a view of immediately and diligently developing same; but first parties are unable at this time to execute and deliver to second parties such oil and gas lease with abstract accompanying same showing clear title and right to do so in first parties, by reason of the fact that said prior lease to the Texas & Pacific Coal Company appears of record on the land records of said Eastland county, Texas, and has not been released, and

"Whereas, it is anticipated and contemplated by first parties that said Texas & Pacific Coal Company will not clear the records by executing a re-lease of its said lease, and that it may become necessary for first parties to commence and prosecute a suit at law against the Texas & Pacific Coal Company to cancel its pretended lease of record; and

"Whereas, said second parties are willing, in order to obtain an option, and to assure themselves of obtaining an oil and gas lease on said premises, to be valid and enforceable as soon as said prior lease to the Texas & Pacific Coal Company has been canceled of record, to assume and pay all expenses incurred and necessary in the employment of counsel and for court costs in the commencement and prosecution of a suit on behalf of said first parties against said Texas & Pacific Coal Company for the cancellation of said lease or in defending any suit that may be brought by the Texas & Pacific Coal Company against first parties to enforce rights which it may claim under said prior lease:

"Now, therefore, in consideration of the premises and the further consideration of one dollar cash in hand paid, the receipt of which is hereby acknowledged and also of the mutual covenants and agreements hereinafter made, it is mutually agreed between said parties as follows:

"That said second parties shall undertake for and on behalf of first parties to clear the records of said Texas & Pacific Coal Company lease by procuring a release or cancellation thereof and promise and agree with first par-

ties to pay all expenses incurred in so doing, including the expense of employing counsel and paying court costs in the prosecution of any necessary suit against the Texas & Pacific Coal Company or its assigns or in defending any suit brought by the Texas & Pacific Coal Company or its assigns for the enforcement of said lease.

"First parties hereby agree that for all the considerations hereinabove specified, they will, whenever requested by second parties, execute and deliver to second parties an oil and gas lease on the above-described premises, upon what·is known as Standard 88 Producers' form and to continue in force for a period of five years from ·and after the date when said prior lease to the Texas & Pacific Coal Company shall be released or canceled of record; for which first parties are to receive as bonus the sum of three hundred twenty-two thousand and no/100 dollars, to be paid out of the ·one-half of the seven-eighths of the first oil produced and saved from said premises (the seven-eighths of said production herein referred to being all of said production above the one-eighth royalty to be provided for in said lease) and it to be further provided in said lease that a well shall be commenced on said lands within sixty days after the prior lease to the Texas & Pacific Coal Company is released or canceled of record.

"And it is further mutually agreed and understood, for the same considerations as hereinabove expressed, that if said first parties should fail or refuse to carry out this agreement by the execution or delivery of the oil and gas lease as above provided, then second parties shall have the right under this contract to enter upon and possess said premises for the sole and only purpose of mining and operation for oil and gas and of laying pipe lines, of building tanks, power stations and structures thereon to produce, save and take care of said product upon the terms, and to pay the royalty, usually provided for in what is known as the Standard Producers 88 form of oil and gas lease.

"The contract and agreement hereinabove set out are to substitute and are in lieu of all other negotiations and agreements heretofore made by the parties hereto and all such other prior agreements as are not included herein are hereby mutually rescinded and set at naught; and to carry out this provision of this contract, it is mutually agreed and understood that certain draft heretofore drawn by first parties on second parties for the sum of three hundred twenty-two thousand ($322,000) dollars and now deposited in the City National Bank of Eastland, Texas, for collection shall be withdrawn from said bank and surrendered to second parties and second parties shall at the time the lease above provided for is executed and delivered, release of record a certain other oil and gas lease made between the parties hereto on the 15th day of March, 1919.

"In witness whereof we have hereunto set our hands this day and date first above written.

        his
"J. C. X Maynard.
       mark
       her
"Blanche E. X Maynard."
       mark

The foregoing instrument was duly acknowledged by both J. C. Maynard and wife,

Blanche E. Maynard, and duly filed for record on August 18, 1919. The reformation indicated in the portion of the judgment which we have above quoted only relates to a description of the lands involved, and as there is no question made on this appeal rendering it important to specify the pleadings and evidence on this point, we have not done so.

The lease to the Texas & Pacific Coal Company, referred to in the contract of March 19, 1919, was duly executed by J. C. Maynard and wife on the 14th day of March, 1917, and is in the general form of oil leases covering the premises in controversy, and extends for a·period of seven years from its date, with a covenant on the part of the coal company to pay an advanced ground rent at the rate of $1 per acre per annum until the royalty provided for in the lease should produce an amount equal to the specified ground rent. ·

The oil and gas lease of date March 15, 1919, referred to in the contract of March 19, 1919, was also substantially in the usual form of an oil and gas lease, and was duly executed and acknowledged by the appellants. By its terms it was to extend for a period of five years from its date, and provided that it should terminate on the 15th day of March, 1920, unless a well should be commenced prior to that date, or unless rentals at the rate of $1 per acre should be paid for extensions of the obligation to drill for 12 months. The lease was duly executed, as stated, and a duplicate copy thereof duly recorded on the day of its execution.

There is no dispute of the due execution of all of the several instruments above referred to, and the answers of the jury to special issues submitted were to the effect that appellees were not guilty of the frauds or misrepresentations alleged by the plaintiffs. Two of the special findings, however, may be material. They are to the effect that both the plaintiffs and the defendants had been informed, prior to the execution of the·instrument of date March 19, 1919, that the Texas & Pacific Coal Company had duly deposited to the credit of J. C. Maynard, in the bank named in its lease as depositary, the rentals therein provided for. These findings are not attacked, and it is undisputed in the evidence that the Texas & Pacific Coal Company in fact so made a due and timely deposit of the rental. In this connection, we will further state that at the time of the execution of the lease to the appellees, dated March 15, 1919, they drew a draft payable to the order of J. · C. Maynard for $322,000 as payment in full for the lease of that date. This draft, with a duplicate copy of the lease, was deposited . in▸the City National Bank of Eastland, the draft being made payable upon approval by West and Gilliam of the title to the land covered by the lease. The draft and duplicate copy so deposited was withdrawn and sur-

rendered to Gilliam and West on the execution of the contract of March 19, 1919.

Appellants, by assignments of error to the action of the court in overruling their demurrers and by assignments attacking the final judgment, complain of the effect given to the instrument of March 19, 1919, hereinbefore quoted, and we think these assignments must be sustained.

[1] The duty to determine the proper construction and legal effect to be given to the instrument referred to are questions of law that in the first instance devolved upon the trial court and now upon this court. The instrument, to our minds, seems so plainly executory in character as to suggest that argument in support of the proposition will perhaps confuse rather than clarify the question. We nevertheless will observe that the instrument speaks for itself. It is unambiguous in its terms, and no issue was presented in the pleadings or evidence of any mistake or omission in making the instrument speak precisely as the parties at the time intended that it should speak. Construing the instrument as a whole, as is proper, and in the light of circumstances surrounding the parties at the time, it seems evident that it was not the purpose of Maynard and wife to then execute an oil lease upon their lands embodying the usual necessary provisions for their protection. They then well knew that they had theretofore made a conveyance of their mineral rights, and presumably as honest and prudent people, did not care to involve themselves in legal difficulties by undertaking to then make an absolute conveyance to others. This was to be done, if at all, only after the obstacle of the prior lease had been removed, then, and not before, was their undertaking to make a conveyance of the mineral rights to appellees. On the other hand, appellees by that instrument only bound themselves absolutely to undertake and perform the labor and expense of instituting a suit against the Texas & Pacific Coal Company to remove the obstacle of the prior lease, then in the minds of both parties. There is therein no absolute undertaking on the part of the appellees to pay appellants any bonus for the lease in any form, or to drill a well or to ever observe any of the restrictions usually imposed upon lessees, and that was imposed upon the appellees by the terms of the former lease, dated March 15, 1919. The necessary implication is that if the lease to the Texas & Pacific Coal Company of 1917 should be adjudged to be a valid and subsisting one, then no obligation was to rest upon Maynard and wife to execute another lease to appellees, nor in that event would any further duty devolve upon appellees to pay or do any further thing. In other words, the binding force of the agreement, in so far as it relates to the disposition of the minerals, is dependent alone upon a future contingency, and cannot be construed as a conveyance of the minerals in præsenti, but only as a contract on the part of appellants to convey such minerals upon a happening of the contingency referred to.

[2, 3] If but a contract to convey, as we have concluded, it follows that it is unenforceable as against the homestead. In the case of Jones v. Goff, 63 Tex. 248, it appears that Jones and wife contracted, for considerations stated, to convey to Goff a part of their homestead. The contract was duly acknowledged by the husband and wife, as in the case before us, and it was held that the homestead cannot be made the subject of an executory contract for its sale by the husband and wife, and that the contract was nonenforceable as against the wife. The court, after citing authorities in support of the rule in courts of equity to that effect, further predicated its holding upon the terms of our Constitution, which declares that a married man shall not "sell the homestead without the consent of the wife given in such a manner as may be prescribed by law," and the further provisions of our law specifying the requirements of the acknowledgment to be made by a wife in conveying her homestead. In the conveyance of the homestead, the wife is required to be examined privily and apart from her husband, and she must acknowledge to the notary public or officer taking her acknowledgment that such instrument is her act and deed, and declare that she had willingly signed the same for the purposes and consideration therein expressed, and that she does not wish to retract it. It was then held, and many times since, that in the conveyance of the homestead the wife has until the very last moment within which to retract her contract or act in conveying the homestead. The principles involved in this ruling have been adhered to a number of times since. See Richardson v. Terry, 212 S. W. 523; Blue v. Connor, 219 S. W. 533; Blakeley v. Kanaman, 107 Tex. 206, 175 S. W. 674.

[4, 5] By counter propositions, however, appellees insist, first:

"The lessors, J. C. Maynard and wife, had the right to alienate a part of their homestead by the giving of a lease such as was given by them to the lessees, Gilliam and West, dated March 15, 1919, and such as was given by them to the Texas & Pacific Coal Company, dated March 14, 1917. The execution of each of said leases was the conveying and alienation of the oil and gas rights in said homestead, and the oil and gas rights having been sold and conveyed in each of said leases, the oil and gas rights were not a part of the appellants' homestead and, by lease and contract of March 19, 1919, providing for an option to purchase said oil and gas rights simultaneously with the setting aside of the instruments alienating the oil and gas rights, was a legal and binding instrument upon the lessors"

—and second, to the effect that the contract of March 19, 1919, is sufficiently definite and specific within itself to operate as a lease or conveyance of the minerals.

We have been unable to concur in either of these contentions. The evidence tends to show that the lease to the Texas & Pacific Coal Company was not subject to the only ground of attack presented in the contract of March 19, 1919, and therefore, presumably, at least as between appellants and appellees, it operated as a conveyance of the minerals, a fact of which appellees were undoubtedly put upon inquiry before the execution of the contract of March 19, 1919. If then conveyed, the minerals were no longer subject to a lawful disposition by appellants. If, in fact, the Texas & Pacific Coal Company's lease was invalid and failed to operate as a conveyance, then the minerals necessarily remained a part of appellants' homestead, and if thereafter, on March 15, 1919, appellants again segregated and separated from their homestead the minerals, the conveyance was abandoned, set aside, and rescinded, and the minerals again resumed their original status. Indeed, we do not think it can be said that this lease ever took effect as such, as it seems that the lease and draft, made by appellants in payment thereof, was deposited in escrow, and not to be delivered until the approval of the appellants' title, which was never done, it being evident that the only basis for the original suit to set aside this lease was the fact that one of the duplicate copies had been recorded, thus casting a cloud upon plaintiffs' title. The minerals, therefore, never having been actually removed from the homestead, nor, according to the theory of appellees at the time of the execution of the instrument on March 19, 1919, removed from the homestead or appropriated by another, must necessarily have maintained their legal status as integral parts of the homestead, and therefore of a nature which precludes a valid disposition thereof by a mere contract to at some future time convey.

What we have already said is perhaps sufficient to dispose of appellees' second contention above named, but we will add that we think the contract of March 19, 1919, not only shows, when construed as a whole, that its purpose was to provide for the execution of a lease in the future, but also that in its very terms it is too indefinite and uncertain as to operate as a lease or conveyances in præsenti so as to authorize, as the court decreed, a writ of possession. This contract cannot be aided by the lease of March 15, 1919, for it is nowhere referred to for that purpose, the only reference being to Standard 88 Producers' form of lease. This form was not introduced in evidence, and is not before us. The form evidently presupposes blanks to be filled with the names of the proper parties, with the consideration to be paid for the period for which the lease is to be extended, and is, of course, always subject to alteration in order to accommodate any specific agreement of the parties. The clause of the contract relied upon in support of the contention that within and of itself it supports the decree awarding to appellees a writ of possession is as follows:

"And it is further mutually agreed and understood for the same considerations as hereinabove expressed that if said first parties should fail or refuse to carry out this agreement by the execution and delivery of the oil and gas lease as above provided, the second parties shall have the right, under this contract, to enter upon and possess said premises for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines, of building tanks, power stations and structures thereon to produce, save and take care of said product upon the terms, and to pay the royalty, usually provided for in what is known as the Standard Producers' 88 form of oil and gas lease."

It is to be noted that by the very provisions of this clause of the contract the right of appellees to enter upon and possess appellants' premises is to arise only in event the first party (appellants) "should fail or refuse to carry out this agreement by the execution and delivery of the oil and gas lease as above provided," viz. the gas lease to be executed upon the forfeiture of the oil lease to the Texas & Pacific Coal Company. This clause of the contract, even when read together with other paragraphs of the same, is too uncertain and indefinite, we think, to operate as a present conveyance of the minerals.

Appellees also make a further contention that the plaintiffs were estopped, but we fail to see any element of estoppel in the case, and conclude that for the reason stated the judgment below must be reversed and here rendered for appellants.